```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

LANDSMAN & FUNK, P.C.,            .
                                 .
        Plaintiff,               .
                                 . Case No. 08-cv-03610
vs.                              .
                                 . Newark, New Jersey
SKINDER-STRAUSS ASSOCIATES,      . January 29, 2015
                                 .
        Defendant.               .
                                 .



                    TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE CATHY L. WALDOR
                UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

 For the Plaintiff:      AYTAN YEHOSHUA BELLIN, ESQ.
                         Bellin & Associates LLC
                         85 Miles Avenue
                         White Plains, NY 10606
                         (914) 358-5345
                         Email: Aytan.bellin@bellinlaw.com


 For the Defendant:      JUSTIN TAYLOR QUINN, ESQ.
                         Gibbons PC
                         One Gateway Center
                         Newark, NJ 07102
                         (973) 596-4781
                         Email: Jquinn@gibbonslaw.com

                         MICHAEL R. MCDONALD, ESQ.
                         Gibbons, PC
                         One Gateway Center
                         Newark, NJ 07102-5310
                         (973) 596-4500
                         Email: Mmcdonald@gibbonslaw.com
```

```
 1   For the Objector:        GLENN A. MANOCHI, ESQ.
                              Lightman & Manochi
 2                            1520 Locust St
                              12th Floor
 3                            Philadelphia, PA 19102
                              (215) 545-3000
 4                            Email: Gmanochi@lightmanlaw.com

 5

 6   Audio Operator:

 7   Transcription Service:   KING TRANSCRIPTION SERVICES
                              3 South Corporate Drive, Suite 203
 8                            Riverdale, NJ  07457
                              (973) 237-6080
 9

10   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (Commencement of proceedings at 2:37 P.M.)

2

3          THE COURT:  Thank you very much.

4          Today is January 29th, 2015.  It is approximately

5    2:40 in the afternoon.  We're here on case 08-3610, and we're

6    here for a final approval of class settlement hearing,

7    attorneys' fees and incentive award.

8              May I have appearances, please.

9          MR. BELLIN:  Good afternoon, Your Honor, Aytan

10   Bellin, Bellin & Associates LLC, class counsel.

11         MR. MCDONALD:  Michael McDonald from Gibbons PC on

12   behalf of the defendant.

13         MR. QUINN:  Good afternoon, Your Honor, it's Justin

14   Quinn from Gibbons, also on behalf of Skinder-Strauss.

15         THE COURT:  Thank you.  And seated in the audience

16   is that -- is that Mr. Manochi?

17         MR. MANOCHI:  Yes, Your Honor.

18         THE COURT:  Is that how you pronounce your last

19   name?

20         MR. MANOCHI:  Manochi, but --

21         THE COURT:  Manochi, thank you.

22         And Mr. Manochi would like to be heard and posits

23   himself as an objector.  Is that correct?

24         MR. MANOCHI:  Both the law firm of Lightman &

25   Associates and myself individually, yes, Your Honor.

 1          THE COURT:  Okay.  So we'll give you the

 2   opportunity to be heard at some point, and we'll give

 3   everybody the attorney to respond.

 4          MR. MANOCHI:  Thank you, Your Honor.

 5          THE COURT:  Thank you.

 6          So Mr. Bellin, I asked you in chambers to carry the

 7   football, if you will, and be the conductor in putting this

 8   and the settlement, the proposed settlement on the record

 9   today.  I accept your submission.  It was very, very helpful

10   to the Court.  And I'm going to let you carry the day.  So go

11   ahead.

12          MR. BELLIN:  Thank you very much, Your Honor.

13          Well, first of all, basically, I'll summarize the

14   settlement and then the various factors that the Court needs

15   to consider in determining whether to finally approve the

16   class settlement proposed.

17          First of all, Your Honor, the settlement provided

18   that we would notify people on the class list that was

19   actually -- well, I'll go to the class list later.  The

20   settlement provides that anybody who's a mem- -- who can show

21   that they're a member of the class, can be -- will get

22   awarded cash benefits in one of two ways.  First of all,

23   there's a common fund that's created by the defendant of

24   $625,000.  And the people can -- class members can make

25   claims on that fund in one of two ways.  They either brought

1   forth actual fax advertisements that they had received from

2   the defendant during the time period covered by the class

3   settlement, which is number of months, it's June of 2008,

4   approximately, through August of 2008, I believe.  So they

5   can either bring forth an actual copy of a fax advertisement

6   they received from defendant and then get $500, which is

7   statutory damages under the Telephone Consumer Protection

8   Act, which is the main statute that the class is suing under

9   in this case.  Or, alternatively, if people have not retained

10  actual the fax advertisements that they received from

11  defendant, then they can come forward and sign an affidavit

12  saying they had received such a fax advertisement during the

13  time period covered by the class settlement, and depending on

14  the number of faxes they claimed they received, between 1 and

15  5, there'd be different amount of damages that they would be

16  awarded.  So if you claimed in your affidavit that you

17  received one fax advertisement, then you get $175.  And up to

18  five fax advertisements, you would get $275.  If you had more

19  than that, you'd still get $275.  Obviously, if people

20  want -- felt that they could bring a case on their own, they

21  were free to opt out.  But they -- it was a sliding scale up

22  to $275 for five fax advertisements.

23          I think it's important to -- to understand in this

24  case that central to the settlement is how the class was

25  determined.  Basically, the defendant -- through discovery we

1    realized -- and the defendants told us -- that they didn't

2    have an actual -- the actual class list of persons to whom

3    they sent out these facsimile advertisements during the class

4    period.  What they -- what we were able to ascertain is what

5    may have been some of the criteria by which they created the

6    fax list back in 2008 when this faxing took place.  And

7    the -- this -- the main dispute -- so they -- they came forth

8    with some criteria they may have used, and the main issue

9    after that portion of the discovery went forward was going to

10   be a debate between our side, the plaintiffs, saying that the

11   criteria that they -- that they had used or that they

12   testified about were sufficiently objective and sufficiently

13   certain to render the class ascertainable, while the defense,

14   I believe, would have said that it was not sufficiently

15   certain because we are only saying what likely criteria we

16   used to create these classes.  We don't actually have it.

17   And that was the nut of the issue.

18          It was at that point that the parties realized that

19   they should probably settle the case, because as I mentioned

20   previously, the Third Circuit has a very strict rule on

21   determining ascertainability of class members under Rule 23.

22   That's one of the -- even though that's not listed in Rule 23

23   as one of the factors to determine class certification, the

24   Third Circuit has decided that it is.  And they have a very

25   strict rule about determining that.  And -- but it is not

1    fully developed.  It's only really been litigated strongly in

2    the last year or two.  There was a case out in 2012 from the

3    Third Circuit, and then another one called Carrera from 2013.

4    And there's really a lot leeway there for them going one way

5    or another in developing this area.

6            Both sides recognized that there were serious risks

7    if they went forward trying to certify a class based on the

8    information that we -- that had come up through discovery.

9    The plaintiff realized that, given the past strictness that

10   the Third Circuit had made clear in their rulings, that there

11   was a possibility, a reasonable possibility that a class

12   certification would be denied, but it wasn't certain.  And

13   the defendants recognized, again, there was still that play

14   in the -- as to what would be sufficient to ascertain -- for

15   ascertainability, and that therefore, they didn't want to

16   risk their client having millions of dollars in damages.

17           So we came after six and a half years of

18   litigation -- and I'll go through the -- how we got to that

19   point, but after six and a half years' litigation, we decided

20   that it's time to settle the case, get the class some money,

21   and move forward.

22           Now, I will go through the Girsh factors, which are

23   the ones set forth by the Third Circuit to -- to help courts

24   determine whether class action settlements are appropriate.

25   The first -- the first Girsh factor is the complexity,

1    expense, and likely duration of the litigation.  Well, as far

2    as duration is concerned, we've already had six and a half

3    years of litigation about this.  The case was initially

4    dismissed by Judge Hayden in 2009.  We immediately appealed

5    to the Third Circuit.  The appeal took a total of three years

6    for the Third Circuit to decide.  It issued an opinion in

7    2011 which had three separate opinions by each of the circuit

8    judges who wrote one.  One of them was a dissent.  At that

9    time, as I pointed out in the papers, it was not clear

10   whether federal courts had any type of subject matter

11   jurisdiction over TCPA cases.  In fact, the Third Circuit had

12   ruled in 1998 that there was no federal question jurisdiction

13   over TCPA cases.  At that time the Third Circuit had never

14   ruled whether there was CAFA jurisdiction under the TCPA --

15   under the TCPA.  Judge Hayden ruled that in this case in her

16   initial decision that there wasn't.  And that was what we

17   were going up to the Third Circuit about.

18          After they had issued their initial opinion in, I

19   believe it was April of 2011, then the defendants, who were

20   very dogged advocates for their client, asked for an en banc

21   review and actually got that granted, which in itself is

22   extremely unusual and shows how complex and serious the Third

23   Circuit talk- -- took this matter.  The case -- the case

24   stayed there until the Supreme Court decided in 2- -- in

25   2012, January, February, I believe, the Mims case, which

1    finally overturned the positions of the vast majority of

2    circuit courts that had held there was no federal question

3    jurisdiction over TCPA cases, the Supreme Court said there

4    was federal question jurisdiction.

5           So then it came back down here again.  And the

6    Third Circuit reinstated its opinion except it left open the

7    question as to whether state law controlled federal class

8    actions under TCPA cases because of strange wording in the

9    TCPA itself left the statute open to that interpretation, and

10   indeed, the Second Circuit in 2010, issued the only extant

11   ruling on that issue at the time, and they had said, yes,

12   indeed, you have to apply state class action law for -- in

13   federal court for TCPA class actions.  And New York, they

14   ruled you can't go forward with class actions under the TCPA

15   in federal court because the New York courts will not

16   allow -- don't allow these sorts of class actions.

17          The New Jersey state courts in 2011 had ruled

18   similarly under the New Jersey class action rule that you

19   couldn't go forward with class actions under the TCPA in New

20   Jersey state courts.

21          So what they were arguing was, well, just like the

22   Second Circuit did, you Third -- we should apply New Jersey

23   state law and basically point -- out of law.

24          But we litigated that issue, and Judge Hayden was

25   only the second district judge in this district to rule on

 1   it.  There had been one previous decision.  And she ruled

 2   that in light of Mims and Supreme Court decisions that,

 3   indeed, contrary to what the Second Circuit ruled, that,

 4   indeed, there was -- we do apply Rule 23 rather than New

 5   Jersey state law.

 6            That, again, was another novel issue that was

 7   decided.

 8            And then after that -- and I'm sorry to go on about

 9   this, but I want to make the record --

10            THE COURT:  No.

11            MR. BELLIN:  -- clear about how hard this was

12   litigated.  After that, we filed -- the plaintiff filed a --

13   a class action sort of placeholder class action to prevent

14   the defendants from trying to make an offer of judgment to

15   moot out the class.  Again, another area, which is rife with

16   conflict, there are cases in the Third Circuit now on this

17   issue, whether you can moot out a class by making an offer of

18   judgment.  There were -- a recent Supreme Court case called

19   Genesis [phonetic], which the other side argued got -- undid

20   all the Third Circuit opinions, and it said you couldn't moot

21   out these sorts of cases in this way.

22            In any event, that was a motion that they made.  It

23   was fully briefed by both sides.  And then it was at that

24   point that we finally -- after we had the discovery that I

25   mentioned earlier, where I -- I had done a deposition of

1  their witness, who talked about how they created the fax

2  list, that we decided that we should probably just call it a

3  day, given all that.

4         I do want to note for the record and I put this in

5  my papers that the very issue that they raised on this

6  motion, on this third motion to dismiss is now on

7  interlocutory appeal to the Third Circuit.  So in other

8  words, these were very, very substantive, strong legal

9  arguments.  I have litigated with many defense attorneys.

10 They did a wonderful job.  They don't need me to say that.

11 They're from Gibbons.  But I would just say that I've

12 litigated against other firms, and luckily for me, I

13 prevailed, but who knows what would have happened, had we

14 continued going forward, or they might very well have

15 prevailed.

16         You know, as you can see, there's a very

17 complicated set of factors.  We did depositions as well.  I

18 don't want to leave out the fact that we did depositions and

19 documents.  They deposed my client for a good part of a day.

20 I deposed some people from them.  So there was discovery that

21 went forward as well.  And we felt that at the time we

22 decided to settle it, that we had a pretty good idea of what

23 sort of the facts were going to be.

24         In terms of the financial ability of the

25 defendants, capability of satisfying a larger judgment, they

1  have provided some materials to me, and it was obvious, based

2  on those materials, that to push this to the n-th disagree

3  and -- even if we had been -- had an inclination do so, we

4  weren't going to be able to collect the millions of dollars

5  that, you know, theoretically we could collect, had we won

6  everything and got the class certified and so forth.

7         So that's why we went to the settlement.  So

8  obviously the complexity and expense have been high up until

9  now.  The duration has been long.

10        THE COURT:  What about the second factor under

11  Girsh?

12        MR. BELLIN:  The second factor, the reactions of

13  the class to settlement.  Over 95 percent of the class

14  members were -- were successfully contacted.  They were

15  contacted first by email.  Then those who weren't contacted

16  by email successfully, were contacted by fax.  And then those

17  who weren't successfully contacted were contacted by -- by

18  first-class mail.  And about 19,000 successful notices went

19  out, out of 20,000 people on the list that had been created.

20  So the 95 percent notice rate, which is a very, very high

21  rate in these sorts of cases, the class has had -- may have

22  had -- I don't believe it's had any opt-outs -- may have had

23  four or five actually.  I think we may have four or five

24  opt-outs.  And we've had no objectors, other than

25  Mr. Manochi, who came -- who's here today, and we'll deal

1   with that there.

2           That factor alone goes to show that the class --

3   the class action settlement is fair.  The cases are rife

4   about that.  You know, even where there are a hundred

5   objectors and there are 20 -- and there are 10,000 class --

6   potential class members, the courts say, no, that's not

7   enough.

8           Here, we have a single one -- or maybe two.  He's

9   now saying that he's representing himself personally,

10  Mr. Manochi, so -- but we'll combine that, I'll probably

11  treat them as one for the sake of argument.  If it's two, it

12  doesn't really matter.

13          So I would say the reactions -- and we've had over

14  300, you know, claims that were -- that have been validated,

15  so people have come forward and made the claims and thought

16  that it was worthwhile to come forward and make the claims.

17          THE COURT:  Right.

18          MR. BELLIN:  So I would say that the reaction to

19  class settlement is very favorable, extremely favorable.  The

20  only thing that could have been better, had there been no

21  objectors, but you can't have perfections.

22          Moving on to the stage of proceedings, I think I

23  mentioned how much we've gone through --

24          THE COURT:  I think you've mentioned stage of the

25  proceedings and the settlement.

1            MR. BELLIN:  -- and the discovery.  The risk of

2     establishing liability and damages, I think I went through

3     that as well.

4            The risk of maintaining class action status through

5     trial, I believe I covered that.  I guess I covered it all in

6     the first factor.  But there were risks for both sides.

7            And the ability to withstand a greater judgment,

8     again, talked about that.

9            The range of reasonableness of the settlement in

10    light of the best possible recovery, in light of all the

11    attendant risks, I believe I've covered that as well.

12            And then the parties' comprehensive notice plan,

13    I've covered as well.  We've contacted 95 percent of the

14    potential class members.

15            And the final allocation is fair.  In fact, it's

16    more than fair, Your Honor, because here we have a situation

17    where, first of all, the person who actually has the fax,

18    gets $500, which is actually the statutory damages under the

19    TCPA.  Theoretically, you could get $1500 if you tripled --

20    if you tripled -- if they could show a willful and knowing

21    violations.  I don't know that we would have been able to

22    show that here.  But $500 is an excellent result for someone

23    who actually had a fax.

24            And now for the people who don't have a fax and

25    just have an affidavit, it's an amazing result.  I mean, if

1   they tried to come and prove that they actually got the

2   fact -- the fax advertisement from the defendants, it would

3   be almost impossible, because they wouldn't be able to show

4   that they were class members in any real way.  They wouldn't

5   show what faxes they got, what the opt-out notices were.

6           And here, we have a situation where -- there was

7   only one claim of person who actually had a fax.  Over 300 of

8   the claims were people who did not have faxes, and they're

9   getting cash awards.  And so I think that that is -- that is

10  a more than fair allocation.

11          THE COURT:  And just to step backwards -- I don't

12  mean interrupt you, but this was an action that was brought

13  under the Telephone Consumer Protection Act because unwanted

14  advertisements were faxed to various class members.

15          MR. BELLIN:  That's correct.  That's the position.

16  And also that either had they been solicited, they -- they

17  didn't have the appropriate opt-out notice the FCC requires.

18          THE COURT:  Okay.

19          MR. BELLIN:  So it was based on those two -- those

20  two theories of liability.

21          So that's -- so under all those factors, I believe,

22  and I submit to the Court that the settlement is an excellent

23  settlement.

24          Now, I can go on to the attorneys' fees, if you

25  want me to, Your Honor.

```
 1              THE COURT:  Yes, and those would be the Gunter

 2   factors?

 3              MR. BELLIN:  Yes, those would be the Gunter

 4   factors, which the courts have pointed out are very

 5   similar to the Girsh factors, so I know I've gone on a long

 6   time.  I will not repeat myself.

 7              THE COURT:  No, that's fine, you're helping the

 8   Court out enormously.  Thank you.

 9              MR. BELLIN:  So first of all, we're talking about

10   the one-third award is reasonable basis on the size of the

11   fund.  And while the fund is significant, $625,000, we're not

12   talking about megasettlements.  Under the case law, when you

13   have megasettlements of a hundred million dollars, that's

14   when the court does say, wait a minute, we're not giving you

15   a third of that.  Sometimes they do anyway.  But that's when

16   things start getting a little dicey.

17              Here, we're well under anything like that.  So

18   that's not a basis not to give the one-third.

19              And in addition, as -- and I'm skipping around some

20   of the factors here, but one-third is really what the market

21   val- -- what the market rate is for these types of

22   settlements.  We listed in the -- in the brief many, many

23   cases, class cases, which gave around one-third, some more,

24   some a little bit less, but basically one-third is well

25   within the range, well in the middle of the range of -- of
```

1    percentage attorneys' fees.

2              THE COURT:  And what about the number of persons

3    potentially benefitted.  I believe you addressed that?

4              MR. BELLIN:  Yeah, well, I said that there were

5    three -- there were 300 -- over 300 people.  Now, look, the

6    claim -- and I will address this after -- if you want me to

7    address the objections after Mr. Manochi --

8              THE COURT:  Yes.

9              MR. BELLIN:  -- make them.  I'll -- do you want me

10   to address now or after?

11             THE COURT:  No, after we hear from Mr. Manochi.

12             MR. BELLIN:  Okay.  So but the bottom -- the case

13   law is clear, starting with Boeing, the Boeing v. Van Gemert

14   case, which is a 1980 Supreme Court case, which is a reverter

15   case, just like this one where they said if monies were not

16   claimed, it would revert back -- it would revert back to the

17   defendant, that it's not the number, it's not the class

18   attorney -- attorneys' fees are not based on the actual

19   claims made by class members but what was available for them

20   to claim.

21             And here there was this significant common fund

22   available for them to claim.  The fact that they didn't come

23   forward is not a basis to reduce the fees.  It's not

24   surprising that after the number of years that this

25   litigation was going on, that there would be 300 out of a

1  potential class, a lot larger class that would have come

2  forward.

3        You know, we made it as easy as possible.  We

4  said -- we didn't have to definitive class list.  We just

5  didn't have.  We didn't have, at least not an established

6  definitive class list.  I don't want to concede that.  But it

7  wasn't established by any decision of this Court.

8        THE COURT:  Right.

9        MR. BELLIN:  The parties couldn't agree on it.

10        So therefore, we made it as easy as possible.  We

11  said either you have the fax, or if you don't have it, come

12  and just give us an affidavit.  That's all you have to do.

13        Even in the absence of what the defendants

14  believed, they believed it was not a definitive class, they

15  were willing to go along with that, which I think was

16  significant.

17        The case started in 2008.  It's almost seven years

18  later.  Are people really going to -- how -- as you just have

19  pointed out, the one that I do agree, it's hard for people to

20  remember this sort of thing after all that time.  But yet

21  there were people who came forward who did remember it.  And,

22  again, the reason for the amount of time that went by had

23  nothing to do with any improper behavior on part of class --

24  the class members or class counsel.  It had to do with the

25  fact that appropriately defendant's counsel were extremely

1   zealous advocates for their clients.  They made every

2   possible argument that you could really make -- that you

3   could really make in good faith.

4           So the fact -- the fact that, you know, 300 people

5   came forward and not 10,000 is not surprising.  Usually in

6   these cases, the response rate is relatively low.  In

7   consumer cases.  In the Third Circuit, in the Baby Products

8   litigation that the defendant -- that the objector cites,

9   point out that they don't want to discourage class actions

10  where there are -- where you don't -- where you think there

11  may not be as much of a response by the class by penalizing

12  attorneys for bringing those types of cases.

13          So let me -- was that -- was that sufficient,

14  Your Honor?

15          THE COURT:  Yes, no, that's good.

16          MR. BELLIN:  Do you want me to address that

17  anymore?

18          Okay.  And then class counsel handled this action

19  in a skilled and effective manner.  I think I represented

20  that.

21          Litigation was complex and of significant duration.

22          We talked about the risk of nonpayment.

23          Plaintiff's counsel devoted substantial time.  We

24  did.  We worked on this for six and a half years, we had over

25  $300 [*sic*] of time that we put into this.  And went up on

1   appeal and had multiple submissions to the Court, so I think

2   that is clearly satisfied.

3           THE COURT:  And that handles complexity and

4   duration of litigation.

5           And what about your firm's and yourself's skill at

6   handling these types of case?

7           MR. BELLIN:  Well, we -- this is one of the main

8   focuses of -- of our firm.  We do a lot of these.  We have a

9   reasonable number of them in the District of New Jersey.  In

10  fact, we just settled another -- another case earlier this

11  week in front of Judge Bongiovanni that, again, was with

12  Gibbons, so we do a lot of these cases.  We have them all

13  over the country.  We have them in Massachusetts.  And we

14  have them in Minnesota now, so we do this a lot.  We've done

15  them for years.  And there many, many published opinions on

16  this area that have my firm's name on it, my name on it as

17  well.  So, you know, we -- we're probably among the most

18  active, if not the most active in sort of the New York-New

19  Jersey area in bringing these sorts of -- these sorts of

20  class actions.

21          So I've been a lawyer.  I graduated law school in

22  1991; hard to believe.  And so I've been a lawyer for 24

23  years almost.  And my colleague, Brian -- who did a little

24  bit of work in this case, has also been on for many years in

25  class actions.  And my associate is older -- graduated in

 1   1989 and has worked on these cases with me.

 2          THE COURT:  Risk of nonpayment?

 3          MR. BELLIN:  Well, there was a risk, because,

 4   again, for the very reason that we didn't know what the Court

 5   was going to do vis-à-vis a class action motion.  We could

 6   have had -- we could have come up with a big goose egg after

 7   all this work, and the class could have gotten absolutely

 8   nothing.  So I think there was a reasonable risk of non- --

 9   nonpayment.  We would have argued otherwise, had we argued

10   it.  But now we're here at the final settlement approval

11   conference, and I will say candidly that it was a difficult

12   issue.  Very, very difficult issue.

13          THE COURT:  What about awards in similar cases?

14          MR. BELLIN:  Courts have awarded -- well, courts

15   have awarded, as I pointed out before, one-third awards.  The

16   cases out in California where we got 1.1 million out of 3.3

17   million.  But TCPA cases, I will -- there have been TCPA

18   cases, but all at one-third.  The case just with Judge

19   Bongiovanni earlier this week, I didn't get to put it in the

20   papers, but she also award- -- she awarded one-third

21   attorneys' fees out of a $2.6 million, approximately, common

22   fund.

23          So it's similar to what's been awarded in other

24   fees in other cases like this.  We did exclusively prosecute

25   this case.  There was no government involvement in this at

1   all.  And the requested fee is consistent with private fee

2   agreements of up to -- of one-third, which I raised earlier.

3           Then we get to the lodestar check, which is

4   probably the most -- probably one of the most convincing

5   factors here in terms of the attorneys' fees.  The Third

6   Circuit routinely says -- routinely -- and they go much --

7   they go higher than this, have said that a lodestar of 1 to 4

8   is routine.  Ours is 1.95.  You know, so -- if we get a

9   third, we're getting 1.95.  We've had many -- multipliers

10  much higher in other cases, and especially given the novelty

11  of this case, you know, if we -- if there was a larger common

12  fund, you know, I'd have asked for more multipliers.  But the

13  common fund's what it is, and I'm not going to -- we're not

14  going to ask more than one-third because the bears win and

15  the bulls win and the hog gets slaughtered.  So we're not

16  going to -- we're not asking for that.

17          But given we're asking for the one-third, the

18  lodestar ratio of 1.95's really so well within the standard

19  of -- that it goes even more to show how fair the attorneys'

20  fees request is.

21          Now, I can turn to the incentive award.

22          THE COURT:  Yes.

23          MR. BELLIN:  This case -- this case has been going

24  on for six and a half years, and, you know, the law firm that

25  was -- that, it actually doesn't even exist anymore.  It just

 1  continues because it's continuing as a plaintiff because --

 2  continues because it's a plaintiff in a couple of these

 3  cases.  But Mr. Landesman had been resolved with us, he

 4  helped -- he had -- he helped us respond to discovery

 5  requests, he showed up for a deposition in Newark, and he's

 6  been -- you know, just been involved with it for six and a

 7  half years.  This is one of those cases where we're asking

 8  for $10,000 incentive award seems -- seemed very reasonable.

 9          THE COURT:  Now, this class has been preliminary --

10  preliminarily certified by Judge Hayden.  Is that true?

11          MR. BELLIN:  That's correct, Your Honor.

12          THE COURT:  And with respect to the Rule 23

13  factors, was there a finding by Judge Hayden?

14          MR. BELLIN:  I think for the purposes of

15  settlement, she preliminary -- she certified the class.

16          THE COURT:  Okay.

17          MR. BELLIN:  Preliminarily certified.  And now that

18  we've had responses, we actually have class members.  We

19  actually know who -- that there are over 300 class members

20  who certify the requirements that we set forth, you know,

21  that were part of the settlement agreement.  You know, the

22  standard rule is that if you have a class of 40 or more, that

23  satisfies the numerosity.  Here, clearly, we do.  If there

24  are common issues of law and fact, common issues of law,

25  whether the faxes that they sent out violated the TCPA,

```
 1   whether they were advertisements, of fact, whether these

 2   clients actually got them and so forth.  Those -- those, as

 3   Judge Hayden, I believe, found those questions of law and

 4   fact predominate over any individual issues.  So there were

 5   no individual issues.  And --

 6             THE COURT:  Typicality?

 7             MR. BELLIN:  I'm sorry?

 8             THE COURT:  Typicality?

 9             MR. BELLIN:  They -- yeah, the claim of the -- the

10   claim of the class plaintiff, who actually got one of the

11   faxes during that period of time.  These faxes were

12   advertisements, was one part of -- as I understood it from

13   discovery, was part of one-time -- not a one-time fax -- fax,

14   they faxed it a number of times, I believe, over the period,

15   the three-month period.  But it was an effort on the part of

16   the defendants who put together the *Lawyers Diary and Manual*,

17   that's the --

18             THE COURT:  Right.

19             MR. BELLIN:  -- the defendants, to have people

20   advertise -- to have lawyers advertise their services in

21   their -- they'd divide the manual, I believe, into certain

22   sections for family law or trust and estates or whatever, and

23   attorneys would -- it was -- asking them to advertise in

24   those sections, if I'm remembering this correctly.  And that

25   was what they were trying to do, and that's exactly the fax
```

1  that my client got.  And it was all part of a unitary program

2  that they had to fax out those advertisements.  So my client

3  was completely typical of -- of all the -- all the class

4  members.

5          So I believe that we -- we satisfied all the

6  requirements for Rule 23 and that, you know, the class should

7  be finally approved.

8          THE COURT:  Let me -- let me hear from the

9  objector, Mr. Manochi.

10          Why don't you come on up and make yourself at home

11  either at the podium or the table, wherever you're more

12  comfortable.

13          MR. MANOCHI:  Wherever everyone can hear me, I

14  think would be probably be best and if you don't mind, right

15  here.  Can I hear you?  Can you hear me?

16          THE COURT:  I can hear you.

17          MR. MANOCHI:  Okay.

18          Your Honor, Glenn Manochi here on behalf of the law

19  firm of Lightman & Associates, now known as Lightman &

20  Manochi, as well as myself individually.  I'm here today to

21  forward the objections that have already been submitted to

22  the Court, and I ask the Court to take a look at each one of

23  those and consider them, given Mr. Bellin's presentation

24  today.

25          I'd kind of like to hit some of the high points of

1  them, not to belabor the issues, as I'm sure Your Honor will

2  read them.

3          First point is I'm sure they're going to object

4  because they don't believe we have standing to raise the

5  issues here today.  I believe we do for a couple of reasons.

6  First and described in the papers, in my declaration, we

7  received, we do our due diligence, we're on the list, we went

8  and hunted down the fax and finally found what was going on

9  here.

10          And that's one thing I'd like to add to that today

11  is the way this whole list came up from Mr. Krivitzky's

12  deposition, who represents Skinder-Strauss.  He's their

13  general counsel.  He put that list together, and a couple of

14  times in that affidavit of his, he put -- he used the phrase

15  that we were presumptive recipients of faxes.  Okay.  So --

16  and that's way the list was generated.  So I would think that

17  this Court should use that as the fact that there is a

18  presumption that the list was sent to these people that were

19  on -- on there just based on Mr. Krivitzky's own affidavit.

20          And more importantly, based on the fact that

21  there's a presumption before this Court, there needs to be

22  some evidence that rebuts that presumption that says I am not

23  or Lightman & Associates is not a member of this class.

24  There being none, I think we have standing.  So in addition

25  to the arguments that we raise in our papers, I would ask the

 1    Court to consider that argument as well.

 2         But the second high point is, you know, I think we

 3    need to do some math here just to understand who's getting

 4    what from this settlement.  And as -- as pointed out by class

 5    counsel, this is a reverted case, so whatever dollars don't

 6    flow to the class members or to class counsel, flow back to

 7    the defendants themselves.

 8         Just put that aside for a second.  The way this --

 9    the actual dollar amount that's going to flow based on what

10    class counsel presents is as follows.  And before I get to

11    that, let me just kind of alert the Court to the fact that

12    there's a Third Circuit case in Baby Products, which I think

13    is an additional factor that must be construed by the Court

14    to determine the reasonableness of the attorneys' fees in

15    this case.  You know, the decision is -- is in there that the

16    court as part of its function needs to determine the direct

17    benefit that is being received by the class.  I think, based

18    on the papers that are here in front of the Court today,

19    that's -- that doesn't jibe with the amount of attorneys'

20    fees that is being requested by class counsel.

21         The math is pretty simple.  You look at the class

22    administrator in the papers submitted, and there is

23    essentially, as I did the math, based on what was received as

24    of January 22d, 2015, there is a total of $58,000 -- $58,225,

25    that is actually going to be distributed.  All right?  There

1 is a couple -- you know, there's -- there's maybe some lag in

2 terms of stuff that hasn't been received.  But that is the

3 total amount that is going to be distributed based on --

4            THE COURT:  The 300 class members?

5            MR. MANOCHI:  Yeah, the 350 -- whatever that number

6 is, and you can see -- yeah, a total of 304 confirmed claims,

7 based on the affidavit submitted by Ms. Keogh, I believe.

8 Yes.

9            Mr. Class Counsel's asking for $208,000, which is

10 some three and a half times that amount.  We submit that that

11 is not a reasonable request based on the direct benefit

12 that's going to flow to the class members here.  And we,

13 thus, think that that is a number that shouldn't be awarded

14 and that is, in fact, unreasonable and unfair to the class

15 members themselves.

16            THE COURT:  So how many dollars in reversion, if

17 you will, does that leave --

18            MR. MANOCHI:  Well, if I -- I did the math while we

19 were sitting here.  And I -- there was nothing in the papers

20 with regard to what the claims administrator's being paid

21 that I could see.  So that's -- that's a function that has.

22            So if we're paying $208,333 to class counsel,

23 58,325 to the actual class members, $10,000 to Mr. Landesman,

24 that's a total of $278,658.  And my math shows that $346,000,

25 or well over half of the supposed $625,000 claim amount is

1   going to revert back to the defendants in the case.

2           And you'll see in the papers, there are -- there's

3   courts, on numerous occasions, that really work out these

4   reverter cases very carefully, because there tends to be a --

5   at least a possibility or the appearance that counsel is not

6   really representing the class, which I don't think they are

7   in this case, because you're getting $58,000, but instead,

8   counsel is kind of more concerned with the fees rather than

9   to the benefit of the class members.

10          THE COURT:  So you're saying fees would ultimately

11  be disproportionate if, in fact, the distribution were

12  200-and-some-odd-thousand dollars.

13          MR. MANOCHI:  Well, the direct benefit to the class

14  as we are in this courtroom today is $58,325.

15          THE COURT:  Right.

16          MR. MANOCHI:  We submit as a matter of law -- and

17  you read the cases, that a three-and-a-half-time amount going

18  to an attorney, based on that recovery is unreasonable,

19  regardless of what criteria you use; whether you use a third

20  or hourly rate or whatever, it's just not reasonable and fair

21  to the class members.

22          You know, we've heard arguments here too that,

23  well, we had trouble finding, you know, another way to get

24  money to the class members or the potential class members,

25  but yet there's lots of ways we could have had claims that

1   were submitted and, you know, give a relatively smaller

2   dollar amount, if you couldn't meet the very, very high bar

3   that you had in these cases for the purposes of making a

4   claim.

5           And, you know, you see them.  You know, to get the

6   actual fax from seven years ago, 500 bucks.  And one of those

7   guys came through.  And I pretty much assume that that's

8   Mr. Landsman, who submitted the affidavit there.

9           So everybody else, didn't hold the fax, doesn't

10  remember, or -- you -- 300 in claims, and, you know, I'm sure

11  they're all -- they all believed under penalties of perjury,

12  which you're required to do in three separate steps in this

13  claims form, that -- that -- and they believe are legitimate

14  claims.

15          But I think the bigger issue here is the fact that

16  there is a -- a very tough bar here that you had to make

17  claims.  And in cases like Baby Products, for instance, there

18  was a class that got paid a much lesser amount -- excuse

19  me -- a much lesser amount, you know, where they didn't have

20  a receipt for the purchase of the product.  If you just --

21  you wrote in, you said I believe I got something, well, you

22  got $5, $10, or whatever it is.  But that really kind of

23  focuses, at least in this case, one of the problems with the

24  case, the fact that you don't have this intermediate ground

25  where you have these very, very, very high bars, which we

1   submit was a possibility of why there's only 304 claims out

2   of 20,000, and there's no middle ground here.  And if it's --

3   this is truly a $625,000 settlement fund, then there should

4   be some mechanism in which the defendant says, you know what?

5   I'm giving up that money, it goes to the class, it's not

6   coming back to me in any -- in any regard except the -- you

7   know, so in other words, no reversion of whatever's left over

8   going back to the defendant.

9           You know, we just think that those are some of the

10  issues here that present problems as far as objectors are

11  concerned.

12          There's -- there's also, you know, this notion that

13  even if, in this case, this Court were to determine that the

14  fee that the class counsel is proposing is unreasonable, this

15  settlement agreement requires that that money go back to the

16  defendants in the case.

17          There is some case law that we cited there, the

18  Staton case there, that indicates that at least in the Ninth

19  Circuit, where that is not a good outcome just because you

20  don't want to reward a defendant for purported bad behavior,

21  at least to the point where they're willing to settle, so

22  those -- those sorts of moneys shouldn't go back.

23          So for all of those reasons, and as well as the

24  other reasons that we cite in our objection, we don't think

25  that this settlement is either fair or reasonable.

1          THE COURT:  Thank you.

2          MR. MANOCHI:  Thank you.

3          THE COURT:  Very much.

4          MR. MCDONALD:  Your Honor, may I be heard briefly?

5          THE COURT:  Mr. McDonald, yes.  Sure.

6          MR. MCDONALD:  I just want to address a couple of

7  the objector's points, and I leave the counsel fee issue to

8  Mr. Bellin and I think Mr. Quinn might have some words as

9  well.

10          With respect to the -- the objectors, there's no

11  standing here, Your Honor, for the objector to make --

12          THE COURT:  What about this presumptive receiver of

13  fax?

14          MR. MCDONALD:  Well, what we're -- what he's

15  talking about a statement in the affidavit which explains how

16  the -- how the fax list was created.  And so what the

17  affidavit is saying is, based upon all the criteria that was

18  learned in discovery from the individual who conducted the

19  process, the company believes that this is -- this is the

20  best list we can come up with.

21          The notice to the class says that there is a class

22  action, and the reason you're being notified is because you

23  might be a class member.

24          THE COURT:  Right.

25          MR. MCDONALD:  Not that are a class member.  It

1   says you might be a class member.

2          And you can determine if you're a class member

3   either one of two ways.  Either, one, you have a fax, or

4   number two, you remember receiving the fax or have some

5   record somewhere of receiving the fax, and are able to sign

6   the statement that says you have a -- you have received a

7   fax.

8          Counsel talked about, you know, a high bar, and he

9   raised his hand pretty high.  The high bar is writing your

10  name.  You know, this is -- I swear that this is true that I

11  believe I received a fax.  It's not -- that's not a difficult

12  bar.  And over 300 people have already signed under penalty

13  of perjury that they believed they received these faxes.

14  These are all lawyers who have received fax advertisement

15  from the publisher of the *Lawyers Diary*.

16         But to have standing to come in and attack a class

17  action settlement, that requires you to be a class member.

18  And none of the actual members of the class that objected to

19  the class and as of the last report from the claims

20  administrator, there were no people who had opted out.  And I

21  think that was in your brief, in the brief from Mr. Bellin.

22             THE COURT:  It was.

23             MR. MCDONALD:  With respect to the actual substance

24  of the objector's argument, he makes a point about the

25  reversion and the reversion being somehow improper.  Well,

1   there's nothing in the law that says the reversion is proper.

2   Particularly in a case like this where you have a case where

3   there's -- we're not talking about instances where people

4   were harmed either physically or economically.

5          This is statutory damage case where people are

6   entitled to receive a benefit of a penalty if they can

7   establish a violation of the TC -- the TCPA.

8          Class action settlements have been approved very

9   recently within the Third Circuit where there are reversions.

10  That's part of the agreement.  And the Court, with all due

11  respect, is not at liberty to change the agreement.  So this

12  is the agreement that we've reached with the assistance of

13  Magistrate Judge Hughes and negotiated with plaintiffs for a

14  very, very long day.  And we reach an agreement that we

15  thought was in the best interests of the class and both

16  parties, and that agreement called for the payments that you

17  see that are -- out in the papers, as well as the reversion

18  for any class claim, for any monies that wouldn't be left

19  over after the payment of counsel fee, after the payment

20  period of all claims, after the payment of the claims

21  administrator's fees.

22         So going into the settlement, all parties

23  understood that there was a fund that would pay everything.

24  And if there's anything left, it would go back to the

25  defendant.  There was no guarantee that there was anything

1    coming back to the defendant.

2            I will let Mr. Bellin address any issues with

3    regard to the counsel fee objection.

4            And unless Your Honor has any other questions.

5            THE COURT:  No, thank you very much.

6            MR. BELLIN:  Thank Your Honor.  I just want --

7            THE COURT:  Mr. Quinn, are you sure you don't want

8    to say anything?

9            MR. QUINN:  I'm happy to say something.  And thank

10   you for the opportunity.

11           THE COURT:  I'm sorry, Mr. Bellin.

12           MR. BELLIN:  That's all right.  That's perfectly

13   fine.

14           MR. QUINN:  So I just -- under the terms of the

15   settlement -- under the terms of the settlement agreement, I

16   think it's pretty clear why Mr. Manochi and his law firm

17   don't have standing.

18           So to obtain payment from the fund, the claimant

19   needs to be a class member, which is defined in the

20   settlement agreement as anyone who from June 15th, 2008,

21   through August 31st, 2008, was sent or caused to be sent one

22   or more facsimiles.  And Mr. Manochi's brief and declaration

23   make clear why he is not a class member.  He says he didn't

24   receive a fax.  He doesn't remember -- he doesn't remember

25   ever receiving a fax.  By definition, he is not a class

 1   member.  And under settled law, only class members can

 2   object.

 3          So -- but under settled law and by his own brief

 4   and declaration, he's not a class member, and he doesn't have

 5   standing to object, Your Honor.  And for that reason, his

 6   objection should be overruled.

 7          Thank you.

 8          THE COURT:  Thank you, Mr. Quinn.

 9          Mr. Bellin.

10          MR. BELLIN:  Yeah, not to beat a dead horse,

11   Your Honor, I just want to --

12          THE COURT:  That's a bad expression in this

13   courtroom.  I'm a horse owner.  Mr. Quinn knows.

14          MR. BELLIN:  Sorry about that.

15          MR. QUINN:  I know that.  That's exactly why they

16   said it.

17          MR. BELLIN:  The case law is clear.  The burden is

18   on the person coming -- the burden is on the person coming

19   forward claiming to be an objector to show they're a member

20   of the class.  It's not our burden to show that he is not.

21   And that's one of the main flaws of his position.

22          Again, in his affidavit, he says he doesn't have a

23   fax, and he says I don't recall having a fax -- getting a

24   fax.  He says that is why I couldn't swear that I got a fax,

25   because he doesn't recall.  That by definition, means he's

1  not a class member.  Now, he's relying on this list that was

2  put together by Mr. Krivitzky, I think that Mr. McDonald made

3  clear why that is insufficient.  That was a list to help us

4  get -- to find out who the members of the class actually were

5  going to -- actually going to be.  We didn't have an absolute

6  list.

7            And so clearly he doesn't have standing.

8            There's no legal presumptive -- there's no legal

9  presumption that he's a class member based on that list.  The

10 fact that he used the word in the thing we presume, and it

11 means he assumes it, because it's the best they could put

12 together.  But we don't really -- he's not saying that he

13 doesn't really know it, and they never would say that they

14 know it, because if they said they knew it for sure, I

15 would -- we wouldn't have settled this case.  The whole point

16 was that they were saying they didn't know and we were saying

17 it was sufficiently certain, and therefore we came to the

18 conclusion.

19            Okay.  Now, this whole argument about reverters and

20 not likely reverters, it's all well and good, except for one

21 thing:  The Supreme Court in Boeing v. Van Gemert in 1980

22 ruled that that was okay.  It was a reverter case.  That was

23 a reverter case, and the Supreme Court said that was fine.

24            And not only that, but courts since then have said

25 that that was fine.  And the Third Circuit in Baby Products

1   case that he cites, you know, it says that Boeing does say

2   that.  It says now, the district court in an appropriate

3   circumstance, if the district court finds that class counsel

4   have not made sure to the best of his or her ability that

5   class members will have access to funds and makes it to where

6   they get access to it, you know, by some machination, the

7   Court says in that situation, it may be an appropriate time

8   to reduce the fees.

9           That's clearly not what's going on here.  In fact,

10  it's very interesting, I wonder -- and I'm only finish

11  hypothetically, not to ask Mr. Manochi to stand up again, but

12  what is his standard for someone making a claim here?  He's

13  saying there should be a lower standard.  Well, if a person

14  doesn't remember they got a fax and they don't have the fax,

15  how can you make a claim?  I mean, it's as simple as that.

16  We made this as easy as possible.  If someone actually

17  remembers, they can say, I swear I remember.

18          THE COURT:  Well, he says in Baby Products that

19  some of the class members said I may have purchased this

20  product or used this product.

21          MR. BELLIN:  I don't believe that that's -- I don't

22  believe that's a fair reading of Baby Products.

23          Not only that, Your Honor, but when you look at

24  Carrera, the issue -- the issue in baby -- in that case was

25  not what makes a class member ascertainable.  If you look at

 1  Carrera, the Third Circuit takes a dim view of people coming

 2  forward and make- -- using -- even using affidavits.  That --

 3  we settled on this and we believe that this is the proper

 4  settlement, but had we pushed it, that's what we were facing.

 5  If they had ruled --

 6          THE COURT:  Especially in light of Third Circuit

 7  law on ascertainability.

 8          MR. BELLIN:  Correct, in Carrera.  I mean, Carrera,

 9  you know, they say -- you can't just -- you -- they don't

10  like it when people come forward and just swear.

11          Now, here, we would have had this other -- this

12  list and the evidence that -- that they used certain factors

13  or what I would say was sufficient evidence.  So it would

14  have been a different case.

15          But we're -- what we're doing here is something

16  that is -- to say the least, it's sort of the lowest level

17  that we can arguably come in front of you and say that is

18  appropriate.

19          If someone -- if you say I may have gotten

20  something, how can you get -- how can you get any monies

21  back.  That's not the way our legal system works.  You have

22  to have some sort of proof, at least a recollection.  And

23  he's saying that people don't have a recollection.  Oh, well,

24  I may have gotten it.  I don't know.  Give me some money.

25  You know, the comment is not how -- how cases work in federal

1   courts or in the state courts.

2          He talks about again the direct benefit to the

3   class in saying that the appropriate -- the appropriate

4   definition of looking at the direct benefit to the class is

5   what did the class actually claim.

6          But, again, barring -- and numerous courts from

7   other circuits have made clear that that's not what you look

8   at.  The benefit to the class that is referred to is the fund

9   that is made available through -- through class counsel's

10  efforts; not what is claimed, but what is made available for

11  claim.

12         And so for him to focus on -- and he admits in his

13  brief, he says, well, you know, it's true that some courts

14  have said that you should look at -- you should look at the

15  amounts claimed.  You should look at the amount that was made

16  available.  And he says Boeing.  But he says Boeing is no

17  longer good law.  That's what he says.  He says the Supreme

18  Court case is no longer good law.

19         How he comes to that conclusion is beyond me,

20  especially since the Third Circuit in the Baby Products case

21  that he cites cites Boeing and says that it's good law, which

22  is a 2013 case.  So I'm just not clear about that.

23         Also strangely, now we have the argument that

24  instead of giving out the amounts that we're giving out, we

25  should have given out lower amounts, smaller awards to class

1   members?  I don't see how that benefits anybody, that

2   everybody should get a dollar instead of getting from 175 to

3   $275, and they should --

4          THE COURT:  Well, your -- your point that preceded

5   about that if they thought they have received it and can sign

6   a certification or affidavit, I mean what is the next level

7   lower?  You posed the question a few minutes ago.  What is

8   the next level?  Is that I could have --

9          MR. BELLIN:  I may have -- I could have received

10  it.

11         THE COURT:  -- I should have received it.  I could

12  have been on a list.

13         MR. BELLIN:  I could have received it.  I'm on this

14  list, and even though it's something that was created to help

15  us get to the class members, that means I did receive it.

16         It means nothing of the nothing of the kind, and

17  that's the very issue that the parties did not want to

18  litigate.

19         So I don't think it -- you know, the attorneys'

20  fees, I've gone through all the factors.  I think I've

21  responded to his claims.  I think they're more than

22  justified.  Again, the lodestar itself cries out and makes

23  clear that it's an appropriate award.

24         Thank you, Your Honor.

25         THE COURT:  Thank you.

1          Mr. Quinn?

2          MR. QUINN:  Can I just make one last point,

3   Your Honor.

4          THE COURT:  And then Mr. Manochi, if you want to

5   come back up.

6          MR. MANOCHI:  May I respond?

7          THE COURT:  Sure.

8          MR. MANOCHI:  I'd appreciate that, Your Honor.

9          THE COURT:  Absolutely.

10          MR. QUINN:  Thank you, Judge.  Part of the

11   objective basis for standing is an email that he received

12   from the claims -- the claims administrator in this case.

13   And I just want to -- to point out one thing.  The language

14   which was improper and incorrect says you are a class member.

15   But attached to that email was the form of notice that was

16   sent out in this case and approved by the Court.  And if you

17   look at Exhibit 1 from Mr. Bellin's brief, it says, and I

18   quote in big, bold, black language on top:  If you received a

19   facsimile advertisement from Skinder-Strauss, you could get

20   payment from class action settlement.

21          And if you go a little bit lower, who's included?

22   You are a class member and could get benefits if you received

23   a fax -- fax advertisement from Skinder-Strauss.

24          So, judge, there's qualitative language there.

25   It's clear.  And I just wanted to point that out for

1    Your Honor.

2           And the same is true on Exhibit 2, which is the

3    longer form of notice, which was also approved by the courts.

4           THE COURT:  Right.

5           MR. QUINN:  Thank you, Judge.

6           THE COURT:  Thank you, Mr. Quinn.

7           Mr. Manochi.

8           MR. MANOCHI:  I'll keep it brief, Your Honor.  I

9    just -- I just wanted to kind of hit some of the high points

10   here.

11          You know, I think we have a self-fulfilling

12   prophecy here.  I mean, if you look at it, 20,000 possible

13   claims, 350 actual -- 304 actual claims.  And I mean, do the

14   math here.  I mean, if -- if there was reasonable -- if this

15   was reasonably objective standards to get to members of the

16   class, would we have had the result that's before this Court

17   today?

18          THE COURT:  I don't know.

19          MR. MANOCHI:  I don't know either.  But all -- but

20   all I know is now that, you know, look, I'm trying to object

21   because I don't remember what happened six years ago, and

22   suddenly everybody's saying, well, it's simple, you just sign

23   this affidavit, and it says under penalty of perjury that you

24   got this thing six years ago, and you're in.

25          I submit to the Court that that is the exact

1  process here, that's limiting the number of claims that are

2  before this Court and as a result --

3          THE COURT:  The fact that people don't remember

4  whether or not --

5          MR. MANOCHI:  They don't --

6          THE COURT:  -- they received this --

7          MR. MANOCHI:  Sure.

8          THE COURT:  -- advertisement.

9          MR. MANOCHI:  You've got to submit to a federal

10 court under a penalty of perjury that you received this

11 thing.  People are going to be -- you know, do I really want

12 to get involved in this if I don't remember, so they're going

13 to -- they're going to err on the side -- not side of not

14 responding to the -- to the claim objection.

15         I don't mean to say and I don't think Baby Products

16 says that the -- that the claims -- that there was a class of

17 claims, and it's in the case itself, I am not making it up,

18 that can -- to where the parties in that case decided that we

19 wanted some level lower than actual proof of receipt of the

20 product that you bought.  And what they came up with is

21 saying that if you said -- if you believed that you got

22 something, you're entitled to submit a claim.

23         We submit that here, if people really wanted to do

24 that, they would have done that.  You know, it is not -- part

25 of the process of going through all of this, you'd have to

1  fill something out, and people, if they're not really

2  interested in -- in getting whatever the reduced number would

3  be if you can't swear under penalties of perjury, people

4  would still fill the thing out if they felt it was worthwhile

5  for whatever number it is.

6          But the class here, unfortunately, didn't have the

7  opportunity to do that.

8          So I submit that, certainly based on the papers,

9  and, you know, you can read the -- the email that I received

10  that says I'm a class member, and, you know, I've gone ahead

11  and done that.  And it's interesting to note too that this

12  class is -- this class of people that -- let me -- I don't

13  want to misquote this here.  Okay.  The class is a member of

14  people -- of people through a particular period of time

15  June 8th -- June 15, 2008, through August 31, 2008, was sent

16  or caused to be sent one or more facsimiles.

17          So it seems to me that the burden of the parties

18  and the -- before this Court here is to establish who was

19  sent that and not require me to say or require any objector

20  to say I received it.

21          THE COURT:  Well, I don't think that's what went

22  on.

23          I think the problem in the case -- and "problem"

24  may be the wrong word -- is in going forward to very

25  specifically ascertain the class, which is what caused this

 1  negotiation settlement.  I don't think anybody's

 2  burden-shifting with respect to receipt of the fax or

 3  potential receipt of the fax.

 4          But I understand what you're saying is there may be

 5  a lower level that could have been resorted to in settlement

 6  of people that may have had some inkling that they received a

 7  fax, other than they may have received a fax.

 8          MR. MANOCHI:  Yeah, and I am not suggesting that,

 9  you know, I understand there is a length of time that went

10  on.  And I understand that this thing went up before the

11  Third Circuit.

12          But there is a real fact of life here is that

13  there's been passage of time from the time that the alleged

14  wrongs occurred to the time that the settlement notice went

15  out, that's six and a half years.  And it would seem to me

16  that, given that length of time, that there should have been

17  some at least consideration of some lesser standard so if

18  this is really a $625,000 pot, that there would be more

19  people that would be able to participate in receiving a

20  portion of that money.

21          THE COURT:  I see.

22          MR. MANOCHI:  I have no further.

23          THE COURT:  Thank you.

24          MR. MANOCHI:  Thank you, Your Honor.  Thank you

25  very much, sir.

1          All right.  I appreciate everybody's participation,

2   and certainly the submissions, which were excellent, and I

3   commented on them.  We will issue an order and opinion in

4   short order.  So thank you very much and have a nice weekend.

5          MR. BELLIN:  Thank you very much, Your Honor.

6          UNIDENTIFIED SPEAKERS:  Thank you, Your Honor.

7          (Conclusion of proceedings at 3:34 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|Hearing
|08-cv-03610, January 29, 2015
Certification

1                            Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3    that the 48 pages contained herein constitute a full, true,

4    and accurate transcript from the official electronic

5    recording of the proceedings had in the above-entitled

6    matter; that research was performed on the spelling of proper

7    names and utilizing the information provided, but that in

8    many cases the spellings were educated guesses; that the

9    transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   S/ *Sara L. Kern*                      6th of July, 2015

19   Signature of Approved Transcriber              Date

20

21

     Sara L. Kern, CET**D-338
22   King Transcription Services
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080
24

25